UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA        :

    - against -        :        92-CR-351
                                         99-CR-112
CARMINE SESSA,        :

          Defendant.        :        United States Courthouse
                                         Brooklyn, New York

- - - - - - - - - - - - - X        September 28, 2000

TRANSCRIPT OF SENTENCE
BEFORE THE HONORABLE DAVID G. TRAGER
UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:

          GEORGE A. STAMBOULIDIS, ESQ.
          Assistant United States Attorney
          Eastern District of New York
          825 East Gate Boulevard
          Garden City, New York 11530

          SINDEE HASNOOT
          Probation Officer
          Eastern District of New York

For the Defendant:

          CHARLES D. LAVINE, ESQ.
          Grossman, Lavine & Rinaldo
          108-18 Queens Boulevard
          Forest Hills, New York 11375

Court Reporter:

          HENRI LeGENDRE*
          225 Cadman Plaza East
          Brooklyn, New York

*Transcribed by JOHN M. JONES, C.S.R., Senior Court Reporter
(retired), Supreme Court Kings County, from the stenographic
notes of HENRI LeGENDRE (deceased).

Proceedings recorded by mechanical stenography, transcript
produced by typewriter.

THE CLERK:  U.S.A. versus Carmine Sessa.  Counsel, note your appearances, please.   For the United States?

MR. STAMBOULIDIS:   George Stamboulidis.

MR. LAVINE:  Charles Lavine for the defendant.

P.O. HASNOOT:  Sindee Hasnoot for the Government.

MR. LAVINE:  I'm going to make a request.  Because of the sensitive nature of a considerable amount of material that may be discussed at this hearing, I'm going to ask that the courtroom be sealed.

THE COURT:  What's the Government's view?

MR. STAMBOULIDIS:  We are not opposing that request.

THE COURT:  You are not opposing it; are you supporting it?

MR. STAMBOULIDIS:   Could I have one moment?

THE COURT:  You haven't been before me for some time.

MR. STAMBOULIDIS:   Not that I forgot how to do my job, just that different Districts have different policies, and sometimes when I'm away I haven't kept up with all the memos.  Thank you for the opportunity to consult.

I understand what Mr. Lavine's request is and I join in that aspect of it but I think he wants where there can be certain safety and personal family circumstances discussed and we would join in that application to seal that portion of the proceedings.

THE COURT:  There is no reason to discuss those aspects of it in connection with this sentence.

MR. LAVINE:  Very good then, your Honor.

THE COURT:  So we'll proceed.   Swear the defendant, please.

THE CLERK:  Stand and raise your right hand.

You swear the answers you are about to give will be the truth, the whole truth and nothing but the truth, so help you God?

THE DEFENDANT:  I do.

THE CLERK:  State your name for the record.

THE DEFENDANT:  Carmine Sessa.

THE COURT:  You do not require an interpreter?

THE DEFENDANT:   No.

THE COURT:   Have you read the pre-sentence report and other reports ahd had them explained by your counsel?

THE DEFENDANT:  Yes.

THE COURT:  Are you ready for sentencing?

THE DEFENDANT:   Yes.

THE COURT:  Are you satisfied with your attorney?

THE DEFENDANT:   Yes.

THE COURT:  Does the attorney have a question of law?

MR. LAVINE:  No, your Honor.

4

1    THE COURT:  Are there any unresolved motions or

2    exceptions?

3    MR. STAMBOULIDIS:  No.

4    THE COURT:  You are seeking a downward departure?

5    MR. LAVINE:  I'm joining in the Government's

6    request for a downward departure for Section 5-K of the

7    guidelines.

8    THE COURT:  As I read the Government letter,

9    theyare giving you a 5-K(1) letter but not with respect to

10   99-CR-112, is that correct?

11   MR. LAVINE:  That is correct.

12   THE COURT:  Are you seeking a downward departure

13   as to 99-CR-112?

14   MR. LAVINE:  No, I am not.

15   THE COURT:  Did you use the proper guidelines manual?

16   MR. LAVINE:  Yes, your Honor.

17   THE COURT:  Court observes the defendant's demeanor

18   and he appears to be capable of understanding these  proceedings

19   and participating in them.

20   Does counsel agree?

21   MR. LAVINE:  I do, your Honor.

22   THE COURT:  Does the defendant waive the further

23   sharing with the defendant and the defendant's counsel of

24   information known to Probation, AUSA or the Court which is not

25   in the reports and does he waive the right, as I think you

1   already have, to publish these reports?

2   MR. LAVINE:  Yes, your Honor.

3   THE COURT:  Any victim statements?

4   MR. STAMBOULIS: No, Judge.

5   THE COURT:  The plea was taken before me, was it?

6   MR. LAVINE:  Yes.

7   THE COURT:  Are you seeking for any reason to now

8   contest that plea?

9   MR. LAVINE:  No, your Honor.

10  THE COURT:  You reaffirm your guilt, sir?

11  THE DEFENDANT:   Yes.

12  THE COURT:  Anybody make any threats or promises to

13  induce you to reaffirm that guilt?

14  THE DEFENDANT:  No.

15  THE COURT:  Do you wish a Fatco (phonetic spelling)

16  hearing?

17  MR. LAVINE:  No, your Honor.

18  THE COURT:  Does the defendant know he can address

19  the Court personally and have witnesses on his behalf?

20  MR. LAVINE:  He does, your Honor.

21  THE COURT:  Do you wish to contest anything in the

22  pre-sentence report or other documents?

23  MR. LAVINE:  Your Honor, it's not a matter of

24  contesting, two minor, very short provisions, very small

25  provisions in the sentence report, but paragraph 105 indicates

6

1   that Mr. Sessa was the actual shooter in five of the

2   murders.   Turns out he was the actual shooter in four and

3   not five of the murders.   And there is one other very

4   minor--

5          THE COURT:  Which one do you want to change?

6          MR. LAVINE:  It's--

7          MR. STAMBOULIDIS:  Paragraph 105, line 3, "shooter

8   in five" should be "shooter in four."

9          THE COURT:  All right, we'll make that change

10  physically in the probation report.

11         MR. LAVINE:  We have one other minor inaccuracy

12  which is contained in the cover page.  (Showing sheet to

13  the Court.)

14         THE COURT:  August 7th instead of April 4th?

15         MR. LAVINE:  Yes.

16         THE COURT:  All right, August 7th.

17         MR. STAMBOULIDIS:  Of '97.

18         THE COURT:  And Probation will make that change

19         MR. LAVINE:  Thank you very much.

20         THE COURT:  Any particularized findings of fact

21  or law either side wishes?

22         MR. STAMBOULIDIS:  No.

23         MR. LAVINE:   No.

24         THE COURT:  The Court has received confidential

25  information concerning this defendant that has been excluded

7

1    from the disclosed portion of the pre-sentence report.

2    This information is relied upon in imposing sentence

3    because the Court is satisfied that the information known

4    to the defendant is accurate, technical summary is unnecessary.

5              Are the calculations correct?

6              MR. LAVINE:  Yes, your Honor.

7              THE COURT:  5-K(1) letter, I could depart, there

8    is no safety valve?

9              MR. STAMBOULIDIS:  No, your Honor.

10             MR. LAVINE:  No.

11             THE COURT:  No obstructions, judgments, enhancements?

12             MR. STAMBOULIDIS:  No, Judge.

13             THE COURT:  The place of incarceration will not

14   be described in view of security requirements, but defense

15   counsel may make known to the Correction authorities the

16   desire of the defendant.

17             MR. LAVINE:  Thank you.

18             THE COURT:  Any assets this defendant has?

19             MR. LAVINE:  No.

20             THE COURT:  Special assessment here is $250,

21   correct?

22             MR. STAMBOULIDIS:  Yes, Judge.

23             THE COURT:  Do you know you can take an appeal from

24   this sentence, sir?

25             THE DEFENDANT:  Yes.

8

1    THE COURT:  Are there limitations in the

2  agreement?

3    MR. STAMBOULIDIS:  May I have one moment?

4    THE COURT:  Yes.

5    (Pause, counsel conferring.)

6    MR. STAMBOULIDIS:  Judge, I need to correct one

7  answer I gave.   The misdemeanor fee was $50.

8    THE COURT:  Any provision in any of the agreements

9  with respect to appeal?

10    MR. STAMBOULIDIS:  Not in the first plea agreement,

11  your Honor.

12    THE COURT:  Well, there may be some limitation, sir,

13  in these various agreements that you have had over the years

14  with the Government.  I will not advise you on how that

15  affects your right to appeal, but your counsel will.

16    Will you advise him?

17    MR. LAVINE:  I will, your Honor, and just to

18  advise the Court in connection with the plea that was

19  entered with respect to Docket 99-CR-112, JBW, the defendant

20  did surrender the right to appeal as long as sentence

21  imposed was not greater than the guideline estimates contained

22  in that agreement.

23    MR. STAMBOULIDIS:  The same is implicit in

24  paragraph 2 of the original, the parties reserve respective

25  rights to appeal and oppose each other if the sentencing court

9

1   imposes--

2           THE COURT:  Slow down.  You haven't gone over that?

3           MR. STAMBOULIDIS:  Some habits are hard to shake.

4   I'll put paragraph 2 before the reporter.

5           THE COURT:  No.  No restitution.

6           Anybody take any property from you that has

7   not been returned, the Government?

8           Any open charges?

9           MR. STAMBOULIDIS:  Yes.

10          THE COURT:  Moving to dismiss?

11          MR. STAMBOULIDIS:  Yes.

12          THE COURT:  Granted.  I'll hear any other matters

13  the parties wish to bring before the Court and I'll hear

14  from the defendant and counsel if they wish to be heard.

15          MR. STAMBOULIDIS: First, may I point out a

16  correction to the 5-K letter submitted to the Court, I think

17  yesterday, dated September 27th.  It was a 12-pag letter with

18  two attachments.   Page 4, five lines down--

19          THE COURT:  Yes.

20          MR. STAMBOULIDIS:  Right after the individual's

21  name, it says, "who was buried."   The word "buried" should

22  be crossed out and the word "murdered" should be inserted.

23          THE COURT:  Okay, I'll make that change.   I'll

24  make the change in this letter and the response of the

25  defense counsel.

1     MR. LAVINE:  Thank you.  With respect to the
2  response that I had submitted to the Court, there is also
3  a typographical omission.   The word "they" was inadvertently
4  omitted from the top of page 3.

5     THE COURT:  Where?

6     MR. LAVINE:  It would be immediately preceding
7  the word "have" at the top of page 3 of the letter of
8  September 26th.

9     THE COURT:  Oh, yes.  I'll put it at the bottom.

10     MR. LAVINE:  Thank you.

11     MR. STAMBOULIDIS:  Your Honor, both Mr. Lavine,
12  myself and the defendant would like to address the Court.
13  In what order would you like us to begin

14     THE COURT:  I'll hear from the defendant, from
15  his counsel and then from the Government.

16     THE DEFENDANT:  Yes, sir.

17     THE COURT:  You can sit if you are more comfortable.

18     THE DEFENDANT:  I don't know if there is anything
19  that I can say to make anyone forgive me, but I would like to
20  try.  I'm very sorry for any crimes, very sorry for the
21  victims and their families who still suffer the losses every
22  day.  I wound up growing up around a life that was and is
23  a disease that has destroyed so many families throughout the
24  years, including my own, which I love and miss so much that
25  it's painful.  I hope some day they can understand me.   I

started shining shoes in clubs and bars in my neighborhood and meeting these people.  Eventually I started stealing and selling things to these people.   I also started working in a card game and getting to know more people and they got to know me as a good kid, a thief, a burglar, a tough kid, a  standup kid.

From there, the crimes escalated eventually to murder and it seems to never stop.   I saw friends get killed.  One day, your friend and the next day somebody says he's got to go for whatever reason and sometimes you're a part of it or even asked to pull the trigger.  You find ourself telling their families you don't know what happened but we're going to find out and them believing you. Everybody gets killed by a bunch of animals or so-called friends.  This thing that I thought I respected as a young man had no respect at all but it did have plenty of disrespect.  All the families hated each other and within the families they hated on another.  It is a disease that keeps growing and spreading.  You cut off the head, a new one grows, cut off an arm, a new one grows.

To me, the more I wanted to be left out ad pulled in and appointed their consiglieri, a position I didn't want.  I was looking to keep far away and ask for them not to give it to me but to no avail.   I hate every-thing about the life I led and hope that it ends some day

1   soon because it keeps destroying families and young kids

2   who are infatuated with it and can't wait to be a good fellow.

3   I wish I could tell them all what it really is and not what

4   they think it is.

5          I don't like what I'm doing, putting people in

6   jail, but I don't want this thing to keep growing so I

7   help when I can.    I accept full responsibility of my

8   crimes and blame no one else, not my associates, not my

9   environment, just me.

10          THE COURT:  Thank you.

11          MR. LAVINE:  Your Honor, beyond what Mr. Sessa

12   has just said and what was contained in the letter that I

13   submitted on the 26th, there is not a whole lot that I can

14   add.  It is an extraordinary journey that Mr. Sessa has been

15   involved with.  Against all odds, he did indeed rebel

16   against the world as he knew it.  For better or worse, he

17   was a part of that world.  As he just advised your Honor,

18   it was often for the worse that he was part of that world.

19          He has done everything that he can to make amends

20   for his conduct.  He has always been sincere.  He has

21   always been truthful.  He has always been accurate in

22   describing that world.   He's a man who is utterly, almost

23   utterly alone.   He has one or two people left in his own

24   real family with whom he is still able to remain close.

25          As the Court is aware, the time that he served,

1   all this time that he has served he has served in isolation.

2   He's shunned, he's ostracized, he's indeed been brutalized.

3   To his remarkable credit, he has not fought back.  To his

4   remarkable credit, he is, at least in the opinion of counsel,

5   entirely sincere when he advises this court that it's his

6   sincere desire to do whatever he can to try to make sure

7   that other youngsters who come from similar backgrounds as

8   his do not end up walking down the same road as he has.

9        I urge the Court to take all this into

10  consideration in fashioning an appropriate and fair

11  sentence.

12       THE COURT:  Thank you.

13       MS. STAMBOULIDIS:  Thank you, Judge.  As Mr. Sessa

14  acknowledges, he committed very serious and very violent

15  crimeswhen he was part of Cosa Nostra, many of which the

16  Government did not know about until he revealed to us

17  his participation in them.  Since then, he's permanently

18  severed his relationship with La Cosa Nostra as a result

19  of becoming a cooperating individual.   He accepts

20  responsibility for crimes, pleads guilty before your

21  Honor  to and for initially those charged crimes that

22  were representative of the most serious crimes in his

23  career as a Cosa Nostra member, knowing at the time that

24  he pleaded guilty before you that on this his sentencing

25  date, his future would likely be decided based on those past

14

1    serious crimes and whatever cooperation he gave, he

2    embarked on the path of cooperation with enthusiasm.

3            Understanding that he gave it his all as a

4    cooperating witness, as set out in the 5K letter that we

5    submitted and we ask the Court to consider his cooperation

6    was extraordinary, it was swift in relationship to his

7    arrest, which allowed the Government to make effective use

8    of it quickly.   It was comprehensive.   He testified in

9    eight Federal trials.  His information led to successful

10   search warrants, led to other individuals making decisions

11   to cooperate and other individuals making decisions to plead

12   guilty.  It also led to the exculpation of two others who

13   were wrongly convicted for a murder he committed.

14           His cooperation included cooperation against

15   others who were far more powerful and significant in La

16   Cosa Nostra than he was and another important aspect of

17   cooperation was timing, as sometimes is the case.  His

18   cooperation came at a crucial time that allowed the

19   Government--and it was a crucial time in modern-day La

20   Cosa Nostra history, especially with respect to the five

21   New York based families--the cooperation came at a time that

22   allowed the Government to put an end to the Columbo family

23   war that plagued the City for wquite a while, '91 through '93.

24           He approached his cooperation--and I worked with

25   him personally on a number of occasions, as did a number of

assistants who are in court today, including the Criminal
Division Chief, Andrew Wiseman.  I also forgot his title.
Associate Attorney General, I believe, or Assistant Attorney
General Jaime Ohrenstein (phonetic spelling), if I
demoted or promoted him, I apologize; Assistant U.S.
Attorney Dan Dorsky, Steven Kielly (phonetic spellings,
who are in court, as well as Supervisor Leadbetter and
many others working with him, as did I.   He approached
that cooperation with great care and thought each of the
parties in the trial were entitled to.

His cooperation had various consequences to him
outside of any possible consideration he may receive on a
day like this at sentencing.  It necessarily, as it often
does in this cases, changes his life, for in a number of
ways it will necessitate his being ostracized in prison
and banished from New York and other areas where La Cosa
Nostra has a prominent presence, should he ever be released
from custody.  And in a most troubling, somewhat ironic,
tragic way his cooperation disrupts the La Cosa Nostra
family but his own family, his biological family, his
relationship with his brother, whose trial you presided
over, his obviously strained relationship with his brother
as a result of that cooperation, also strained his relationship
with his biological family that he created, is also quite
strained, to say the least.

. FORM FED-25  ●  PENGAD · 1-800-631-6989

1      I won't go through and summarize what we have

2 already written to you in our letter.  It summarizes his

3 extraordinary cooperation and the truly substantial

4 assistance he gave us thusfar each year for approximately

5 seven years.   We appreciate the cooperation he gave at

6 great personal risk and cost to him and his family.

7      As we promised in the plea agreement we entered

8 into, we move under 5-K 1.1 to downwardly depart from the

9 guidelines with respect to the information docketed

10 92-CR-351.

11      Thank you, Judge.

12      THE COURT:  Thank you.

13      As far as 92-CR-351 is concerned, your 5-K(1)

14 covers that completely, both any possible minimum as well

15 as to the guidelines.

16      MR. STAMBOULIDIS:  Correct, your Honor.

17      THE COURT:  As to that--

18      MR. STAMBOULIDIS: I should point out one further

19 thing.  Sorry for interrupting.  I haven't lost that habit

20 either.

21      THE COURT:  It's okay.

22      MR. STAMBOULIDIS:   When he leaves here, not

23 necessarily today, sometime in the near future, he will

24 go before Judge Glasser to be sentenced on the open

25 violation of probation that he never settled, in the summer

1    of '92.

2              THE COURT:  I recognize that.

3              As to 92-CR-351, the defendant is sentenced to

4    time served and supervisory release.   I'll say a little

5    more about the terms of supervisory release in just a

6    moment.  And I think in that case it's what, fifty or a

7    hundred?

8              MR. STAMBOULIDIS:  Fifty.

9              THE COURT:  Fifty dollars.

10             MR. STAMBOULIDIS:  Special assessment.

11             THE COURT:  As a special assessment and no fine.

12   That's in lieu of a live sentence which could have been

13   imposed.

14             As to the two counts in 99-CR-112, maximim term,

15   99-CR-112 is still life, is it not?

16             MR. LAVINE:  I'm sorry.  Under 99--

17             MR. STAMBOULIDIS:  No.

18             THE COURT:  How much?

19             MR. STAMBOULIDIS:  Ten years.

20             THE COURT:  Maximum ten years,   I'm sorry, for

21   count one and maximum five years for count two, correct?

22             MR. STAMBOULIDIS:  Yes, your Honor.

23             THE COURT:  With no minimum.

24             MR. STAMBOULIDIS:  Right, no minimum.

25             THE COURT:  Now, on that I impose a hundred

18

dollars special assessment as to each count, three years
supervisory release on count one, five years on count two,
concurrent with the five years on 92-CR-351.

That's appropriate, is it not?

P.O. HASNOOT:  Yes.

MR. STAMBOULIDIS:   The supervisory release
was three years on count one or were they combined?

THE COURT:  All concurrent on the supervisory
release.

MR. STAMBOULIDIS:  I see.

THE COURT:  And the supervisory release need not
be intense.  That depends on cooperation between the
Probation Services and various other services of the
Government concerned with the safety of this defendant.  Is
that clear?

MR. STAMBOULIDIS:  Yes, your Honor.

THE COURT:  So that leaves open the question of
incarceration on counts one and two, 99-CR-112.

MR. LAVINE:  Yes.

MR. STAMBOULIDIS:   Yes.

THE COURT:  No minimum.  Now, as to those counts,
in that incarceration, he's been incarcerated to this date
under intense security controls within the place of
incarceration, is that right?

MR. LAVINE:  Yes, he has.

1    THE COURT:  And cut off from normal visiting

2    for reasons of alienation already described by the

3    United States Attorney, is that correct?

4    MR. LAVINE:  Yes, your Honor.

5    THE COURT:  Under those circumstances, subject

6    to hearing the views of counsel for the Government and

7    counsel for the defendant, it would be my inclination to

8    sentence him to time served, which would date back to

9    April 3, 1993, with releases and (illegible stenographic

10   outline--J.J.) in 1998 on a complex paper, correct?

11   MR. STAMBOULIDIS:   Yes, your Honor.

12   THE COURT:  The reason for that being that the

13   time in prison would have to be under very severe circum-

14   stances enhancing the nature of the punishment to the point

15   where it might be deemed cruel and inhuman under the

16   Constitution and the problem of protecting the defendant

17   under the Witness Protection Act or whatever  procedures

18   the Government will utilize would be much simplified by a

19   release contemporaneous with this sentence.

20   However, in view of the very severe crimes

21   committed by the defendant, but in light of the substantial

22   cooperation and other aspects referred to by the Government

23   and defense counsel in their open statements and their

24   sealed comments as seems appropriate, that is to say, it

25   appears time to cut the relationship in view of what the

FORM FED-25  ⊛  PENGAD · 1-800-631-6989

20

1  Government suggests in its communication is sincere

2  rehabilitation.   What is the Government's view, if any?

3       MR. STAMBOULIS:   As is our practice--I remember

4  this much--as is our practice, we take no position on the

5  actual sentence.

6       THE COURT:  But such a sentence would be consistent,

7  would it not, with the various letters and relationships

8  described in this correspondence and other material?

9       MR. STAMBOULIS:  Yes, Judge.

10      THE COURT:  All right, that's the sentence.

11      MR. LAVINE:  May we have one moment?

12      THE COURT:  Any other matter you wish to take

13  care of?

14      MR. LAVINE:  Judge, we have an unusual request

15  which we have discussed beforehand, counsel and defendant

16  and the Government and that is, in order to accommodate the

17  sentence that the Court has discussed here, it being time

18  served--let me--I'm not taking a position the defense  needs

19  to make the request.   It's sort of a procedural snag and

20  that is for reasons having to do with the Witness Protection

21  Program and other features of this, he would have to be in

22  custody for another 30 days.

23      THE COURT:  The release is stayed for 30 days.

24      MR. LAVINE:  Thank you.

25      MR. STAMBOULIDIS:  At this time we move to dismiss

21

all open counts as against this defendant in the 92-CR-351

series of superseding indictments and the original indictment.

THE COURT:  Thank you.  Good luck, sir.

THE DEFENDANT:  Thank you very much, your Honor.

THE COURT:  I just want to remind you there

was one defendant sometime ago who went to Arizona before me--

you remember the case--and he slid back and he spent,

I believe, ten years in prison as a result of that slip.

So good luck and bear that in mind.

THE DEFENDANT:  Thank you very much, your Honor.

You won't hear from me no more.

THE COURT:  I hope not.

* * * * *

Certified to be an accurate transcript of the
minutes taken by HENRI LeGENDRE in the above
proceeding, to the best of my ability.

John M. Jones, C.S.R.
Senior Court Reporter (retired)
New York State Supreme Court
Kings County